[Cite as *Raines v. Hodgson*, 2020-Ohio-3404.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY


| | | |
|---|---|---|
| ADAM C. RAINES, | : | |
| Appellee, | : | CASE NO. CA2019-09-011 |
| | : | O P I N I O N |
| - vs - | | 6/22/2020 |
| | : | |
| CHRISTOPHER L. HODGSON, et al., | : | |
| Appellants. | : | |


CIVIL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. 2018-0156


Bruce S. Wallace, 108 South High Street, P.O. Box 467, Mt. Orab, Ohio 45154, for appellee

Joseph Hale, 4156 McDermott Pond Creek Road, McDermott, Ohio 45652, for appellants


**HENDRICKSON, P.J.**

{¶1}   Appellants, Christopher L. Hodgson and Sherri L. Hodgson ("the Hodgsons"), appeal from a judgment of the Brown County Court of Common Pleas entered in favor of appellee, Adam C. Raines, on Raines' claim for an implied easement by prior use, which allows Raines to use leach lines located on the Hodgsons' property for his septic system. For the reasons set forth below, we affirm the trial court's decision.

{¶2}   As relevant to the present appeal, in 1993, James and Mable Kitchen owned 11.386 acres of land in Sardinia, Washington Township, Brown County, Ohio.  The land,

which was vacant and undeveloped, was split into two plots, a western tract totaling 5.642 acres and an eastern tract, totaling 5.744 acres. The western tract was sold to the Hodgsons in 1993. The eastern tract was sold to the Hodgsons' good friends, David and Barbara Kirker, by land contract.

{¶3} After receiving title to the western tract, the Hodgsons placed a manufactured home on the property and, in 1994, installed a septic system. The holding tank was placed on the western tract behind the manufactured home. However, the leach lines for the septic system crossed over the property line onto the eastern tract owned by the Kirkers. There was no written easement for the leach lines.

{¶4} The Hodgsons eventually took over the Kirkers' payments under the land installment contract. In 1994, ownership of the eastern tract was transferred to the Hodgsons, giving the Hodgsons title to both the eastern and western tracts of land. In 1996, the Hodgsons sold 2.5 acres of the western tract to Iralyn Heringer. The Hodgsons continued to maintain their residence on the remaining 3.142 acres of the western tract of land.

{¶5} In 2001, Travis Lang expressed an interest in buying the remaining 3.142 acres of the western tract where the manufactured home sat. However, due to certain "legal issues," Lang did not want to have the property put in his name. Thus, the property was to be sold to Lang's girlfriend, Lisa Highfield, in exchange for $90,000. According to Christopher Hodgson ("Christopher"), he and his wife were advised that lending for Highfield's purchase would not be approved unless the property had a functioning septic system that included leach lines. In order to ensure Highfield was able to obtain financing, Christopher claims an agreement was made with Lang wherein the parties would exchange equal amounts of land so that the property where the leach lines ran on the eastern tract would be deeded to Highfield, thereby becoming part of the western tract, and a portion of

the western tract that encompassed road frontage would be deeded to the Hodgsons, thereby becoming part of the eastern tract. Lang was the party responsible for arranging and paying for the survey and documents required for this transaction.

{¶6} Highfield closed on her purchase of the 3.142 western tract in February 2002. Christopher claims that at the time of closing, Lang informed Highfield's lending bank and the Hodgsons that a survey had been completed and Lang would forward the necessary documents to the bank and to the Hodgsons the day after closing so that the issue with the leach lines could be resolved. The Hodgsons presumed that the necessary steps had been taken by Lang or else the bank would not have released the $90,000 in funds to them. After the closing, the Hodgsons began to do limited maintenance on the road frontage that was part of the western tract and Lang began mowing the grass in the area where the leach lines were located on the eastern tract. Sometime later, the Hodgsons learned that Lang had not had a survey completed or taken the necessary steps to transfer the land where the leach lines laid to the western tract. Nonetheless, Lang and Highfield continued to use the leach lines located on the Hodgsons' property until Highfield's property was foreclosed upon sometime around 2005.

{¶7} After it was foreclosed upon, the manufactured home on the western tract sat vacant for a number of years. In 2011, Raines decided to purchase the foreclosed property, which was in disrepair. Shortly before closing on the 3.142-acre western tract, Raines learned that the leach lines for the property he was purchasing were located on the neighboring property owned by the Hodgsons. After discussing the issue with Christopher and being told they would work something out, Raines purchased the property. From September 2011 to October 2017, Raines made repairs to the manufactured home sitting on the western tract. He and his family did not live on the property, but Raines worked on the property weekly. During this time, Raines claimed the property's septic system

functioned properly. Shortly after Raines and his family moved into the renovated home in 2017, Raines claimed the Hodgsons dug up and cut the leach lines at the property line between the eastern and western tracts. The Hodgsons then parked vehicles overtop of the leach lines. Raines claimed the Hodgsons' actions caused his septic system to stop functioning properly, required his septic tank to be pumped a number of times, and caused his property to be cited as a public health nuisance by the Brown County Department of Health.

{¶8} On March 9, 2018, Raines filed suit against the Hodgsons, seeking a judgment declaring that he had a legal right to use the leach lines located on the Hodgsons' property as he (1) had obtained an easement by prescription; (2) had obtained an easement by necessity; or (3) had an implied easement. He also sought monetary damages for the Hodgsons' wrongful interference with the easement. The Hodgsons filed an answer, in which they admitted to capping the leach lines that extended from Raines' property onto their property and admitted to placing vehicles on top of the existing leach lines. They otherwise denied the allegations set forth in Raines' complaint.

{¶9} A trial before a magistrate was held on January 16, 2019, at which time Stephen Dick, the Environmental Director with the Brown County Health Department, Raines, and Christopher testified. Dick testified that on October 18, 2017, after receiving a nuisance complaint, he inspected Raines' property and found that the leach lines for Raines' septic tank had been cut and capped at the property line between Raines' property and the Hodgsons' property. Dick took a photograph of the capped lines and opined that the lines appeared to have been cut and capped "recently," or "within a month," because "the piping that was coming up out of the – the cap looked new."[1] Although he did not know the exact

---

1. The photograph Dick took of the capped leach lines was admitted into evidence as the court's "Exhibit A."

date the lines had been cut and capped, he was "very comfortable" stating that the leach lines had been cut off within a very short period of time before his inspection.

{¶10} Dick also testified about the steps Raines would have to take to bring the western tract up to code if Raines was unable to use the leach lines that ran onto the Hodgsons' property. Dick described two different systems that might be required by the county, noting that it would cost Raines between $7,000 and $15,000 to install a new system involving leach lines and between $20,000 and $30,000 to install a mound system.

{¶11} Raines then testified about his purchase of the 3.142-acre western tract, his use of the septic system and leach lines during his repair of the property, and the Hodgsons' actions in cutting the leach lines in 2017. Raines explained that he was advised of the location of the leach lines shortly before closing on the western tract in 2011. He stated he went to view the property and found a ditch dug at the property line between the western tract and the Hodgsons' eastern tract. Although a ditch had been dug, no leach lines were found by the Hodgsons at that time. Raines testified he spoke with Christopher about the leach lines running from the western tract onto the Hodgsons' property and Christopher informed Raines that he intended to cut the lines. However, the lines were not cut as Raines and Christopher reached an agreement. Raines testified, "we talked and everything, and I asked for – to work something out, and that's when he told me he'd either give me an easement or sell me land, not to worry about it, we'll work somethin' out." Operating on the "good faith of [his] neighbor's word that [they would] work something out," Raines went ahead and purchased the western tract in 2011.

{¶12} Raines then began renovating the manufactured home. Although he was not "fully liv[ing] there," he stayed at the property some nights and did weekly work on the property. Raines testified the septic system was functioning appropriately during the renovation process, stating "it was hooked up and I – stuff got put down the toilet and the –

the sink." During renovations, the septic tank never had to be pumped and Raines never saw any sewage seep out onto the ground. Raines testified that while renovating the property, he had a number of talks with Christopher about obtaining an easement and was always advised by Christopher that "[they would] work somethin' out." Raines continued to use the septic system without incident until October 2017.

{¶13} Raines and his family moved into the renovated property near the end of September 2017. Shortly after this occurred, sometime in October 2017, the Hodgsons brought a mini excavator onto their property and dug up, cut, and capped the leach lines near the property line separating their tract of land from Raines' tract of land. The Hodgsons then parked a camper and portable shed near the property line, overtop of the leach lines. After this occurred, Raines started experiencing trouble with his septic system. His tank, which he had never had to pump before, had to be pumped multiple times. He also noticed that the ground near his septic tank had a wet, sewage smell to it.

{¶14} Raines testified that it would be an extreme financial hardship for him and his family if they were forced to install an entirely new septic system rather than being permitted to continue to use the leach lines that were installed with the existing septic system for his property. He stated he has borrowed the maximum amount that he can against his property and is unable to borrow any additional funds to update or replace the septic system.

{¶15} Christopher testified that after purchasing the western tract of land in 1993, he placed the manufactured home on the property and installed the septic system. While the septic tank was placed on the western tract behind the home, the leach lines were run onto the neighboring, eastern tract of land, which was owned by his friends, the Kirkers. He eventually purchased the eastern tract of land and sold off the western tract of land, with 2.5 acres of undeveloped land being sold in 1996 to Heringer and 3.142 acres of land, which included the manufactured home, being sold in 2002 to Highfield.

{¶16} Regarding the 2002 sale to Highfield, Christopher testified that it was really Highfield's boyfriend, Lang, who wanted to purchase the 3.142 acres. To ensure that Highfield could get financing for the purchase of the property, Lang and Christopher reached an agreement regarding the leach lines that ran on the eastern tract of land owned by the Hodgsons. According to Christopher, Lang was supposed to pay to have the land surveyed so that the land where the leach lines were located could be transferred to Highfield in exchange for the road frontage property on the western tract being transferred to the Hodgsons. Despite Lang claiming that he had the land surveyed and would provide the necessary documents to the bank and to the Hodgsons to facilitate the transfer, Lang never followed through and the land transfer never occurred.

{¶17} Christopher testified that he cut the leach lines running from the western property onto his property in 2005, after Highfield went into foreclosure. He claims Raines never had working leach lines when Raines bought the western property and that he warned Raines of this fact before Raines' purchase. Christopher testified that after warning Raines about the leach lines, Raines said he would "work something out with [Christopher]." In response, Christopher said, "Do you think so?" and left the conversation at that. He denies that he agreed to work something out with Raines regarding the leach lines.

{¶18} Christopher testified that although he cut the leach lines in 2005, in 2017, he dug the lines back up so that he could put a cap on the leach lines. He claimed he "put a 90 on it and put of piece of line, about this tall (indicating), with a cap on it, to the top of the ground, so that [Raines] knew it was cutoff." According to Christopher, this newly placed cap is what Dick saw when he inspected the property line on October 18, 2017.

{¶19} Following Christopher's testimony, the magistrate took the matter under advisement and permitted the parties to file briefs as their closing arguments. On March 26, 2019, the magistrate issued a decision finding in favor of the Hodgsons on Raines'

claims for an easement by prescription, an easement by necessity, and an implied easement by necessity. However, the magistrate found in favor of Raines on his claim for an implied easement by prior use. In doing so, the magistrate found Raines' testimony that the leach lines were cut in 2017 more credible than Christopher's testimony that the lines were cut prior to Raines' purchase of the western tract. The magistrate ordered the Hodgsons

> permit the leach lines to be reattached to [Raines'] septic system. The boundaries of the implied easement shall extend to ten feet on either side or end of the leach lines to enable the system to be properly serviced or repaired. The [Hodgsons] shall not erect any structure in the area of the easement, nor shall they park any vehicles in the area of the implied easement nor shall they interfere in any way at all with the use of [Raines'] implied easement.

Raines' claim for damages for interference with the easement was denied by the magistrate.

{¶20} The Hodgsons filed six objections to the magistrate's decision, objecting to four of the magistrate's findings of fact and to the magistrate's conclusion of law regarding an implied easement by prior use. The Hodgsons further objected to "findings of fact NOT made by the Magistrate" concerning their 2002 agreement with Lang about the exchange of property so that the land where the leach lines sat would become part of the 3.142-acre western tract. The Hodgsons argued certain findings regarding this transaction should have been made by the magistrate as the findings were relevant to the analysis of whether an implied easement by prior use existed. Raines filed a response to the Hodgsons' objections, arguing that the objections were without merit and should be overruled. On August 14, 2019, the trial court issued a decision overruling the Hodgsons' objections and adopting the magistrate's decision in full, finding that "the Magistrate properly determined the factual issues and appropriately applied the law."

{¶21} The Hodgsons appeal, raising seven assignments of error.

{¶22} Assignment of Error No. 1:

{¶23} THE TRIAL COURT'S "ENTRY OVERRULING DEFENDANTS' OBJECTIONS TO MAGISTRATE'S DECISION," ON ITS FACE, FAILS TO SATISFY THE REQUIREMENT THAT THE TRIAL COURT CONDUCT AN INDEPENDENT REVIEW AS TO THE OBJECTED MATTERS AND FAILS TO INDICATE THAT THE TRIAL COURT CONDUCTED AN INDEPENDENT REVIEW AS TO THE OBJECTED MATTERS AS REQUIRED BY CIVIL RULE 53(D)(4)(d).

{¶24} In their first assignment of error, the Hodgsons argue the trial court erred by adopting the magistrate's decision without conducting an independent review or ruling on their objections. They argue the trial court should have specifically and individually addressed their objections, including their "objection to findings of fact not made by the magistrate."

{¶25} Civ.R. 53(D)(4)(d) provides that

> [i]f one or more objections to a magistrate's decision are timely filed, *the court shall rule on those objections.* In ruling on objections, *the court shall undertake an independent review as to the objected matters* to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law. Before so ruling, the court may hear additional evidence but may refuse to do so unless the objecting party demonstrates that the party could not, with reasonable diligence, have produced that evidence for consideration by the magistrate.

(Emphasis added.)

{¶26} Therefore, "Civ.R. 53(D)(4)(d) imposes a mandatory duty on the trial court to dispose of a party's timely-filed objections to a magistrate's decision." *Lynch v. Lynch*, 12th Dist. Warren No. CA2006-12-145, 2007-Ohio-7083, ¶ 8. Although not required to "*address* each and every portion of an objection raised by [a] party," the court is nonetheless required to "*rule* on each objection." (Emphasis sic.) *Pietrantano v. Pietrantano*, 12th Dist. Warren No. CA2013-01-002, 2013-Ohio-4330, ¶ 20. A trial court's failure to rule on objections and

to conduct an independent review of the magistrate's decision as required by Civ.R. 53(D)(4)(d) constitutes an abuse of discretion. *Ohio Bar Liab. Ins. Co. v. CCF Dev., LLC*, 12th Dist. Butler Nos. CA2017-12-170 and CA2017-12-175, 2018-Ohio-3988, ¶ 22.

{¶27} "Ordinarily, a reviewing court will presume that the trial court performed an independent review of the magistrate's decision." *Id.* at ¶ 23, citing *Kairn v. Clark*, 12th Dist. Warren Nos. CA2013-06-059 and CA2013-08-071, 2014-Ohio-1890, ¶ 11. Therefore, "the party asserting error bears the burden of affirmatively demonstrating the trial court's failure to perform its duty of independent analysis." *Pietrantano* at ¶ 14. "[S]imply because a trial court adopted the magistrate's decision does not mean that the court failed to exercise independent judgment." *Id.* "A trial court may adopt a magistrate's decision in whole or in part pursuant to Civ.R. 53(D)(4)(b) so long as the court fully agrees with the magistrate's findings 'after weighing the evidence itself and fully substituting its judgment for that of the [magistrate.]'" *Kairn* at ¶ 11, quoting *Pietrantano* at ¶ 14.

{¶28} The Hodgsons' arguments that the trial court failed to conduct an independent review of the magistrate's decision or rule on their objections is without merit. In the trial court's entry overruling the Hodgsons' objections and adopting the magistrate's decision, the court stated it had reviewed the trial transcript, the exhibits admitted at trial, the memoranda of counsel, and the supplemental memorandum of the parties. The court then ruled on all of the Hodgsons' factual objections, stating:

> After reviewing the transcript, the Court finds that the Findings of Fact are consistent with the testimony of all the witnesses. The Magistrate obviously chose not to believe all of the testimony of the Defendants [sic]. The validity of those findings is clearly revealed by a thorough reading of the transcript. The objections to the Findings of Fact are overruled in their entirety.[2]

---

2. The Hodgsons argue the court's statement that the magistrate "chose not to believe all of the testimony of the *Defendants*" demonstrates the court did not conduct an independent review of the record because, if it had, the court would have realized only one of the defendants – Christopher Hodgson – had testified at trial. We find the trial court's reference to the "testimony of the Defendants" was a typographical error rather than a statement that both Christopher and Sherri Hodgson had testified at trial.

{¶29} The court further ruled on the Hodgsons' objection to the magistrate's legal conclusion that Raines had established an implied easement by prior use and ruled on their objection to certain findings of fact not being made regarding Raines' and Christopher's interactions over the years, Raines' interactions with his real estate agent in 2011 before purchasing the western tract, and the Hodgsons' 2002 agreement with Highfield and Lang. In rejecting these objections, the trial court stated, in relevant part, as follows:

> The Court further having made an independent review of the facts and law pursuant to Civ.R. 53(D)(4) of the Ohio Rules of Civil Procedure and legal analysis that the Magistrate applied during his decision-making, *finds that the Magistrate properly determined the factual issues and appropriately applied the law*.

(Emphasis added.)

{¶30} Although the trial court may not have discussed the Hodgsons' objections in as much detail as the Hodgsons would have liked, the record nonetheless reflects that the trial court conducted an independent review of the magistrate's decision and ruled on all of the objections. We therefore find no merit to the Hodgsons' arguments and overrule their first assignment of error.

{¶31} Assignment of Error No. 2:

{¶32} THE TRIAL COURT'S FINDING THAT "THE MAGISTRATE PROPERLY DETERMINED THE FACTUAL ISSUES" IS ERRONEOUS RELATIVE TO THE MAGISTRATE'S FINDING OF FACT NUMBER 10 IN THAT THE AGREEMENT BETWEEN THE "INTERIM OCCUPANT" AND THE DEFENDANT[S]-APPELLANTS CONTEMPLATED A TRANSFER OR EXCHANGE O[F] LAND AND NOT AN EASEMENT.

{¶33} In their second assignment of error, the Hodgsons argue the trial court erred in overruling their objection to "Finding of Fact Number 10," arguing that the finding is not supported by the record.

{¶34} In "Finding of Fact Number 10," the magistrate found as follows: "There was

an interim occupant of Plaintiff's land after the Defendants moved next door.  That person was supposed to have a survey done and recorded so that *an easement could be recorded.* That never happened."  (Emphasis added.)

{¶35}  As a general rule, the trial court, as the trier of fact is "best able to view the witnesses, observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of witnesses."  *Cadwallader v. Scovanner*, 178 Ohio App.3d 26, 2008-Ohio-4166, ¶ 9 (12th Dist.), citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77 (1984).  As such, "a reviewing court will presume that the trial court's findings of fact are accurate."  *Id.*

{¶36}  The "interim occupant of Plaintiff's land" mentioned in Finding of Fact Number 10 referred to Highfield and Lang.  Though the magistrate stated the "interim occupant" was supposed to have a survey completed so that "an easement could be recorded," there was no testimony presented at trial indicating that the survey was to result in an express easement.  Rather, the testimony presented at trial indicated that Lang was to pay to have the land surveyed so that the land where the leach lines were located on the eastern tract could be transferred to Highfield in exchange for road frontage on the western tract being transferred to the Hodgsons.  As the magistrate noted, the survey and transfer of land never occurred.

{¶37}  We find that the trial court erred in overruling the Hodgsons' objection to Finding of Fact Number 10 to the extent that the finding referred to an effort to obtain an express easement.  However, we find that this error was harmless as it did not affect the analysis of whether an easement by prior use was established.  As discussed in further detail in our resolution of the seventh assignment of error, regardless of whether a future easement or a future land transfer was intended, the fact remains that at the time the 3.142 acres was severed and sold, the parties operated with an understanding that Highfield

would use the existing septic system on the western property, including the leach lines that traveled onto the eastern property. Then, despite Lang not having a survey completed or seeking to have the land transferred, he and Highfield were permitted continued, uninterrupted use of the leach lines at all times that they were on the property.

{¶38} Accordingly, as the factual error made by the magistrate did not affect the outcome of the proceedings, we find that the trial court committed harmless error in overruling the Hodgsons' objection to Finding of Fact Number 10. The Hodgsons' second assignment of error is overruled.

{¶39} Assignment of Error No. 3:

{¶40} THE TRIAL COURT'S FINDING THAT "THE MAGISTRATE PROPERLY DETERMINED THE FACTUAL ISSUES" IS ERRONEOUS RELATIVE TO THE MAGISTRATE'S FINDING OF FACT NUMBER 11 IN THAT THE MAGISTRATE'S FINDING THAT THE PLAINTIFF-APPELLEE "ELECTED TO CLOSE ON THE SALE" EVEN THOUGH HE WAS "FULLY AWARE OF THE ISSUE WITH THE LOCATION OF THE LEACH LINES" BECAUSE "HE WAS OF THE BELIEF THAT EVERYTHING WAS WORKED OUT" IN THAT THIS FINDING OF FACT WAS NOT SUPPORTED BY THE TESTIMONY AND EVIDENCE AT TRIAL.

{¶41} In their third assignment of error, the Hodgsons argue the trial court erred in overruling their objection to "Finding of Fact Number 11," arguing that the finding is not supported by the record.

{¶42} In "Finding of Fact Number 11," the magistrate found that "[a]t the time the Plaintiff closed on the purchase of his property, he admits that he was fully aware of the problem with the location of the leach lines, and he *elected to close on the sale because he was of the belief that everything was worked out.*" (Emphasis added.) The Hodgsons maintain that the evidence admitted at trial does not support the idea that Raines closed on

the property because he believed everything had been worked out. In support of their contention, the Hodgsons' rely on Christopher's testimony that he and Raines had not reached an agreement when they discussed the leach lines before Raines' purchase of the 3.142-acre western tract. They also point to testimony from Raines that sometime after his purchase, around 2012 or 2013, he hired an attorney and attempted to obtain an express easement or to buy the land where the leach lines laid as evidence that there was never an agreement reached between the parties prior to Raines' 2011 purchase.

{¶43} Christopher's testimony about whether an agreement was reached conflicted with Raines' testimony on the issue. Raines testified that prior to his purchase of the western tract, he and Christopher talked and the two reached an agreement. Raines stated, "we talked and everything, and I asked for – to work something out, and that's when he told me he'd either give me an easement or sell me land, not to worry about it, we'll work somethin' out." Raines further explained that he only contacted an attorney in 2012 or 2013 because he "wanted to get something in writing."

{¶44} The trier of fact bears the burden of assessing the credibility and veracity of the witnesses and, as such, "is free to believe all, part, or none of the testimony of each witness." *Bartells v. Bertel*, 12th Dist. Butler No. CA2016-11-216, 2018-Ohio-21, ¶ 63. The magistrate found Raines' testimony about this issue to be more credible than Christopher's testimony. As there was competent and credible evidence in the record to support the magistrate's Finding of Fact Number 11, the trial court did not err in overruling the Hodgsons' objection to it. The Hodgsons' third assignment of error is overruled.

{¶45} Assignment of Error No. 4:

{¶46} THE TRIAL COURT'S FINDING THAT "THE MAGISTRATE PROPERLY DETERMINED THE FACTUAL ISSUES" IS ERRONEOUS RELATIVE TO THE MAGISTRATE'S FINDING OF FACT NUMBER 12 IN THAT THE PORTION OF THE

MAGISTRATE'S FINDING OF FACT NUMBER 12 WHERE THE MAGISTRATE FOUND THAT "THE PLAINTIFF USED THE SEPTIC SYSTEM DURING THE TIME HE WAS REHABILITATING THE PROPERTY AND ALWAYS FOUND IT TO BE IN PROPER WORKING ORDER" WAS NOT SUPPORTED BY THE TESTIMONY AND EVIDENCE AT TRIAL.

{¶47} In their fourth assignment of error, the Hodgsons argue the trial court erred in overruling their objection to "Finding of Fact Number 12," arguing that the finding is not supported by the record.

{¶48} In "Finding of Fact Number 12," the trial court stated that "[t]he property purchased by the Plaintiff was not in good repair, and it took Plaintiff several years to rehabilitate the property so that it was habitable.  He did not have it in livable condition until 2017.  *The Plaintiff used the septic system during the time he was rehabilitating his property and always found it to be in proper working order.*"  (Emphasis added.)  The Hodgsons contend that the evidence admitted at trial does not support the finding that the septic system was always in proper working order, as the court relied solely on Raines' testimony, which "oversimplifie[d] the rehabilitation process" and was, at times, contradictory.  The Hodgsons' point to various points in Raines' testimony wherein he states that he began using the septic system in 2011, after taking possession of the property, but then indicates that he did not have the water to the property turned on until after replacing the home's plumbing in 2013.  The Hodgsons contend that "[w]ithout an inflow of water, there was no way for the plaintiff [t]o know if the septic system worked in 2011."

{¶49} We find that the trial court did not err in overruling the Hodgsons' objection to Finding of Fact Number 12 as there was competent and credible evidence in the record to support the magistrate's finding that the septic system worked during Raines' renovation of the property.  Raines' testimony, as found credible by the trier of fact, established that the

septic system worked properly for several years while Raines' worked to repair and renovate the property. Regardless of whether 2011 or 2013 is used as the point in time when Raines began using the septic system, there was sufficient credible evidence for the magistrate and trial court to conclude that the septic system was working properly until the leach lines were cut in 2017. Accordingly, the trial court did not err in overruling the Hodgsons' objection to Finding of Fact Number 12, and the Hodgsons' fourth assignment of error is overruled.

{¶50} Assignment of Error No. 5:

{¶51} THE TRIAL COURT'S FINDING THAT "THE MAGISTRATE PROPERLY DETERMINED THE FACTUAL ISSUES" IS ERRONEOUS RELATIVE TO THE MAGISTRATE'S FINDING OF FACT NUMBER 13 IN THAT FINDING OF FACT 13 CONTAINED FACTUAL ERRORS THAT WERE CLEARLY IN CONFLICT WITH AND CONTRADICTED BY THE EVIDENCE AND TESTIMONY AT TRIAL.

{¶52} In their fifth assignment of error, the Hodgsons argue the trial court erred in overruling their objection to "Finding of Fact Number 13," arguing that the finding is not supported by the record.

{¶53} In "Finding of Fact Number 13," the trial court found as follows:

> There appears to be only one disputed fact. The Defendant [Christopher Hodgson] claims that *he capped off the leach lines in 2011*. The Plaintiff claims that they were cut off in 2017. The Court accepts the Plaintiff's version. This is based on the fact that the system worked with no problem before 2017 and the sudden necessity of repeatedly needing to pump out the septic tank since 2017. *The Defendants'* [sic] *Exhibit "A" showing the capped leach lines in 2017 make it clear to the Court that the lines had only recently been severed.* The ground in the area was not discolored by effluent nor was there any moisture detected. Either or both of those conditions would be expected if the lines had been inoperative for about six years.

(Emphasis added.)

{¶54} The Hodgsons argue that the evidence admitted at trial does not support the magistrate's finding that Christopher claimed to have capped the leach lines in 2011. They note that Christopher's trial testimony indicated he severed the leach lines in 2005 and then re-dug up the lines in 2017 in order to place a cap on the ends of the previously severed lines. The Hodgsons also take issue with the magistrate's reference to "Exhibit A," noting that "Exhibit A" was a court exhibit, not an exhibit offered into evidence by the defendants. This exhibit was a photograph taken by Dick, who examined Raines' property in October 2017 and observed the severed and capped leach lines running on the Hodgsons' property. The Hodgsons' take issue with Dick's testimony that the leach lines appeared to have been cut and capped "recently" or "within a month" of his inspection of the property. They contend that the magistrate should not have relied on Dick's testimony because Dick "could not make a determination of when the leach lines were actually severed" and the photograph was only relevant to show that the leach lines had been capped recently – a fact consistent with Christopher's testimony. The Hodgsons argue the magistrate erred by "confus[ing] the act of capping the leach lines with severance of the leach lines."

{¶55} The Hodgsons are correct in their assertion that Christopher testified he cut the leach lines in 2005 and then re-dug the leach lines in 2017 to cap them. To the extent that the magistrate indicated Christopher "capped the leach lines in 2011," this was error as there is no evidence in the record to support this statement. However, the error was harmless, as the trial court clearly believed Raines' testimony that the leach lines were both cut and capped in October 2017, after Raines and his family moved onto the western tract full-time. The magistrate, as the original trier of fact, was in the best position to observe Raines' and Christopher's demeanors, gestures, and voice inflections, and assess their credibility at trial. The magistrate chose to believe Raines' testimony that the septic system worked properly until 2017, when the lines were cut and capped by Christopher. The trial

court, after an independent review of the record, agreed. We will not second-guess this determination, especially as there was other competent and credible evidence presented at trial to support the magistrate's finding that the leach lines had been cut in 2017.

{¶56} Specifically, Dick's testimony and the photograph taken by him on October 18, 2017, which was admitted as the court's "Exhibit A," supported the magistrate's determination that the leach lines were cut and capped in 2017. Although Dick did not know the exact date the leach lines had been cut, he testified he was "very comfortable" stating that the lines had been cut-off within a very short period of time before his October 18, 2017 inspection. Dick had a conversation with Christopher about the leach lines in 2017. Notes Dick took about this conversation indicated the following:

> Spoke to Mr. Chris Hodgson in the Brown County Health Department Office. He told me that he dug up and capped the septic lines. That he would not make any repairs to the septic system. Would take a set of plows to the whole leach field, if he lost the court case. Told him the best solution would be to repair the existing leach field with proper permits and let the courts decide who was in the right.

{¶57} Furthermore, "Exhibit A" allowed the magistrate a view of what the leach lines and property surrounding the leach lines looked like on October 18, 2017. Relying on this picture, Raines' testimony, and Dick's testimony the magistrate determined that Raines' version of events was more credible than Christopher's version. As competent and credible evidence existed to support the magistrate's decision that the leach lines had "only recently been severed" in October 2017, we find that the trial court did not err in overruling the Hodgsons' objection to Finding of Fact Number 13. The Hodgsons' fifth assignment of error is, therefore, overruled.

{¶58} Assignment of Error No. 6:

{¶59} THE TRIAL COURT'S FINDING THAT "THE MAGISTRATE PROPERLY DETERMINED THE FACTUAL ISSUES" IS ERRONEOUS IN THAT THE TRIAL COURT

COMPLETELY FAILED TO ADDRESS THE DEFENDANT[S]-APPELLANTS' SIXTH OBJECTION TO THE MAGISTRATE'S FINDINGS OF FACT RELATIVE TO FINDINGS OF FACT NOT MADE BY THE MAGISTRATE.

{¶60} In their sixth assignment of error, the Hodgsons argue the trial court erred by overruling their sixth objection to the magistrate's decision, wherein they asserted that the magistrate failed to make certain factual findings they believe were necessary to a resolution of Raines' claim for an easement by prior use. Specifically, the Hodgsons contend that the trial court failed to address their arguments that additional findings of fact should have been made relating to Raines' and Christopher's interactions over the years, Raines' interactions with his real estate agent in 2011 before purchasing the western tract, and the Hodgsons' 2002 agreement with Highfield and Lang.

{¶61} We have already addressed the Hodgsons' argument that the trial court failed to rule on and specifically address their objections to the magistrate's decision, including their sixth objection. For the reasons set forth in our resolution of the Hodgsons' first assignment of error, we find no merit to their argument that the court failed to rule on their sixth objection. The trial court addressed and overruled the Hodgsons' sixth objection when it stated, in relevant part, that "[t]he objections to the Findings of Fact are overruled in their entirety," that "the Magistrate properly determined the factual issues and appropriately applied the law," and that "Defendants' Objections filed on April 8, 2019, Defendants' Amended Objections filed on April 9, 2019, and Defendants' Supplement to Defendants' Amended Objections filed on July 5 are hereby overruled."

{¶62} To the extent that the Hodgsons' contend that additional findings of fact were necessary to the resolution of Raines' claim for an implied easement for prior use, we reject their argument. The findings of fact made by the magistrate, which were later adopted in full by the trial court, were sufficient to resolve Raines' claims for an easement. The

Hodgsons' sixth assignment of error is, therefore, overruled.

{¶63} Assignment of Error No. 7:

{¶64} THE TRIAL COURT'S FINDING THAT "THE MAGISTRATE APPROPRIATELY APPLIED THE LAW" IS ERRONEOUS RELATIVE TO CONCLUSION OF LAW (C)(2) IN THAT THE MAGISTRATE CONSPICUOUSLY FAILED TO CONSIDER "WHAT MUST HAVE BEEN THE REAL INTENT OF THE PARTIES" RELATIVE TO A CLAIM OF "IMPLIED EASEMENT BY PRIOR USE," PURSUANT TO *CADWALLADER V. SCOVANNER*, IN FINDING THAT THE PLAINTIFF-APPELLEE HAD ESTABLISHED A CLAIM OF "IMPLIED EASEMENT BY PRIOR USE," WAS CLEARLY NOT SUPPORTED BY THE EVIDENCE AND TESTIMONY, AND WHICH WAS PREJUDICIAL TO THE DEFENDANT[S]-APPELLANTS, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS REVERSIBLE ERROR.

{¶65} In their seventh assignment of error, the Hodgsons argue the trial court's finding of an implied easement by prior use for the leach lines is against the manifest weight of the evidence and that the trial court erred by not sustaining their objection to the "Magistrate's Conclusion of Law (C)(2)" regarding this issue. The Hodgsons further argue that the magistrate and trial court failed to correctly apply the law regarding implied easements by prior use, as set forth in *Cadwallader v. Scovanner*, 2008-Ohio-4166, as neither the magistrate nor the trial court considered the "real intent of the parties" at the time the 3.142-acre western plot was sold by the Hodgsons.

{¶66} "When evaluating whether a judgment is against the manifest weight of the evidence in a civil case, the standard of review is the same as in the criminal context." *Ford v. West*, 12th Dist. Fayette No. CA2017-11-025, 2018-Ohio-2626, ¶ 9; *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. Thus, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines

whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Carson v. Duff*, 12th Dist. Fayette Nos. CA2017-03-005 and CA2017-03-007, 2017-Ohio-8199, ¶ 11, citing *Eastley* at ¶ 20. "When reviewing the decision of a trial court as to whether an easement exists, an appellate court will not reverse the judgment as being against the manifest weight of the evidence if the judgment of the trial court is based on some competent, credible evidence going to all essential elements of the case." *Cadwallader*, 2008-Ohio-4166 at ¶ 9. *See also Carson* at ¶ 11.

{¶67} "An easement * * * [is] 'a right without profit, created by grant or prescription, which the owner of one estate [called the dominant estate] may exercise in or over the estate of another [called the servient estate] for the benefit of the former.'" *Trattar v. Rausch*, 154 Ohio St. 286, 291 (1950), quoting Yeager *v. Tuning*, 79 Ohio St. 121, 124 (1908). Easements may be created by an express grant, by implication, or by prescription. *Cadwallader* at ¶ 10. "Implied easements are based on the principle that when an individual conveys property, he also conveys whatever is necessary for the use and enjoyment of that property." *Yowonske v. MDB Constr. Co.*, 7th Dist. Belmont No. 09 BE 10, 2010-Ohio-4185, ¶ 17, citing *Deyling v. Flowers*, 10 Ohio App.3d 19 (8th Dist.1983), paragraph two of the syllabus. "In Ohio, 'implied easements are not favored because they are in derogation of the rule that written instruments speak for themselves.'" *Cadwallader* at ¶ 10, quoting *Trattar* at 291. Nonetheless, "a party that clearly demonstrates that it has acquired a right to use the land of another may establish an easement by implication." *Id.*

{¶68} There are two types of implied easements: an implied easement by necessity and an implied easement by prior use. *Id.* at ¶ 14. Though the elements are the same for both types of implied easements, "different standards apply when analyzing the third element." *Id.* at ¶ 14. As the present case centers around the trial court's finding of an

implied easement by prior use, we limit our analysis to this issue.

{¶69} To establish an implied easement, the plaintiff must present clear and convincing evidence of the following elements: (1) a severance of the unity of ownership in an estate; (2) that before the separation takes place, the use which gives rise to the easement shall have been so long continued and obvious or manifest as to show that it was meant to be permanent; (3) that the easement is reasonably necessary to the beneficial enjoyment of the land granted or retained; and (4) that the servitude is continuous as distinguished from a temporary or occasional use only. *Cadwallader* at ¶ 15, citing *Campbell v. Great Miami Aerie No. 2309, Fraternal Order of Eagles*, 15 Ohio St.3d 79 (1984). *See also Ciski v. Wentworth*, 122 Ohio St. 487 (1930), paragraph one of the syllabus. "Considered in conjunction with the four necessary elements, an implication via prior use is based on the theory that 'where an owner of land makes apparent, permanent, and necessary use of one part of his land in favor of another part, and transfers either or both parts, the grant or reservation of an easement to continue such existing use will be implied.'" *Cadwallader* at ¶ 36, quoting *Freiden v. Western Bank & Trust Co.*, 72 Ohio App. 471, 475 (1st. Dist.1943). Therefore, "[a]n analysis of an implied easement necessitates consideration of both the owner's intent at severance as well as what occurs between subsequent owners of the dominant and servient estates." *Id.* at ¶ 17, citing *Campbell* at 81.

{¶70} The first of the four elements required for establishing an implied easement by prior use, that there be severance of a prior unified estate, was proven at trial. The record clearly reflects the prior unity of title and reveals the subsequent severance of that title leading to the present dispute. The Kitchens first owned the unified property before severing the estate in 1993. Subsequently, ownership of the property was reunified when the Hodgsons took possession of the eastern and western tracts of land in 1994. The

Hodgsons used the whole of the property upon retaining ownership in 1994. They later split the estate, selling 2.5 acres of undeveloped land from the western tract to Heringer in 1996 and selling the remaining 3.142-acres of the western tract to Highfield in 2002, which included the manufactured home and septic system the Hodgsons installed on the property in 1994. The Hodgsons retained ownership of the eastern tract of land.

{¶71} Turning to the second element required for an implied easement, the supreme court has recognized that "[f]or a use to be permanent in character * * * a mere temporary provision or arrangement made for the convenience of the entire estate will not constitute that degree of permanency required to burden the property with a continuance of the same when divided or separated by conveyance to different parties." *Trattar*, 154 Ohio St. at 292. "Instead, the use must be continuous, apparent, permanent, and necessary to the use and enjoyment of the land. * * * Use will be considered apparent when it is 'plainly visible.'" *Cadwallader*, 2008-Ohio-4166 at ¶ 16, citing *Campbell* at 81. Furthermore, "an easement may be apparent even though it is not readily visible if it may been seen or known on a careful inspection of the premises by a person ordinarily conversant with the subject." *Campbell* at 81.

{¶72} The trial court concluded that before the Hodgsons' separation of the eastern and western tracts, the use of the leach lines giving rise to the easement was "long continued and obvious or manifest as to show it was meant to be permanent." We find competent, credible evidence was admitted to support this finding. Christopher and Raines testified at trial that when the Hodgsons had the septic system installed on the western property in 1994, they chose to run the leach lines across the property line onto the eastern tract of land. This was not a problem for the Hodgsons, as they intended to take ownership of the eastern plot of land, and, at the beginning of February 1994, they did take ownership of the land from their friends, the Kirkers. From 1994 to 2002, the Hodgsons personally

used the leach lines that ran from their home onto the eastern tract of land. Then in 2002, they sold the western tract of land to Highfield, who continued to use the leach lines that ran onto the eastern tract of land until her ownership was foreclosed upon sometime in 2005.

{¶73} The Hodgsons' eight years of use of the leach lines before severance of the western tract from the eastern tract is long enough to establish permanency. As we have previously noted, "[u]nlike a prescriptive easement, which requests strict adherence to continual use for 21 years, an implied easement does not require passage of any set amount of time." *Cadwallader*, 2008-Ohio-4166 at ¶ 23. Rather, "the use which gives rise to the easement shall have been *so long continued and obvious or manifest as to show that it was meant to be permanent*." (Emphasis sic.) *Id.* Use of the leach lines running on the eastern property for the proper functioning of the septic system was apparent and known by the Hodgsons – and by every individual who took ownership of the 3.142-acre western tract subsequent to the Hodgsons. The second element required for an implied easement by prior use was therefore established by clear and convincing evidence.

{¶74} With respect to the third element required for an implied easement by way of prior use, "a court will apply a reasonably necessary standard." *Cadwallader* at ¶ 37, citing *Martin v. Sheehy*, 33 Ohio App.3d 332 (11th Dist.1986). That is to say that "'[t]he law relating to implied easements based upon an existing and prior use does not require [a court] to entertain the alternative possibilities.'" *Id.*, quoting *Mapes v. Smith*, 8th Dist. Cuyahoga No. 81065, 2003-Ohio-428, ¶ 23.[3] A plaintiff need only show that the easement is "reasonably necessary to the beneficial enjoyment of the land granted or retained." *Id.*

---

3. Compare the third element in a claim for an implied easement by prior use to that of a claim for an implied easement by necessity. In the later, the individual claiming an easement must show that the easement is strictly necessary rather than reasonably necessary. *Tiller v, Hinton*, 19 Ohio St.3d 66, 69 (1985); *Cadwallader v. Scovanner*, 178 Ohio App.3d 26, 2008-Ohio-4166, ¶ 30 (12th Dist.).

at ¶ 15.

{¶75} The testimony submitted at trial demonstrated Raines consistently used the leach lines after purchasing the 3.142-acre western tract in 2011. Raines testified the leach lines were functioning properly during his renovations of the manufactured home. He stated, "it was hooked up and I – stuff got put down the toilet and the – the sink." During the renovation process, which spanned from his purchase in 2011 until the time he and his family moved into the home on a full-time basis near the end of September 2017, the septic system, including the leach lines, worked properly. Raines did not see any sewage seep out onto the ground and he did not need to have the septic tank pumped. However, beginning in October 2017, after the Hodgsons cut and capped the leach lines, Raines started experiencing trouble with his septic system. His septic tank had to be pumped multiple times and the ground near his tank had a wet, sewage smell to it.

{¶76} Dick, the Health Department's Environmental Director who inspected Raines' septic system on October 18, 2017, testified that the leach lines had been cut-off within a very short period of time before his inspection. As a result of the leach lines being cut, Raines did not have a properly functioning waste system and steps would need to be taken to bring the western tract up to code. Dick described two different systems that the county could require Raines to install at his property, noting that it would cost Raines between $7,000 and $15,000 to install a new system involving leach lines and between $20,000 and $30,000 to install a mound system. Raines explained it would be an extreme financial hardship if he were not permitted to use the existing leach lines, as he had borrowed the maximum amount of money that he could borrow against the property and would be unable to borrow any additional funds to update or replace the septic system. Raines' and Dick's testimony supports the trial court's conclusion that the easement was reasonably necessary for Raines to have beneficial use of his property.

{¶77} The fourth element that must be established to show an implied easement by prior use is that the servitude was in continuous use, and not merely in temporary or occasional use. The testimony submitted at trial demonstrated that the leach lines running onto the eastern property have been used by every individual who has lived in the manufactured home on the western tract since 1994. After the Hodgsons sold the property to Highfield, she and Lang used the leach lines attached to the home's septic tank. After the property was foreclosed upon and purchased by Raines, he too used the leach lines – first during renovations of the property and then when he and his family moved into the property. Continuous use of the leach lines was stopped only when the Hodgsons cut and capped the leach lines in October 2017. The record, therefore, supports the trial court's conclusion that the use had been continuous.[4]

{¶78} Despite the aforementioned evidence supporting the existence of an easement by prior use, the Hodgsons argue the magistrate and trial court erred by failing to consider the "real intent of the parties" at the time the Hodgsons sold the western tract of land to Highfield in 2002. As we've previously recognized, "[a]n analysis of an implied easement necessitates consideration of both the owner's intent at severance as well as what occurs between subsequent owners of the dominant and servient estates." *Cadwallader*, 2008-Ohio-4166 at ¶ 17, citing *Campbell* at 81.

{¶79} We find that the magistrate and trial court did consider the Hodgsons' intent at the time of severance, as well as their actions and behaviors after the time of severance. The record reflects that the Hodgsons permitted Highfield and Lang to use the leach lines

_____

4. Within their seventh assignment of error, the Hodgsons continue to challenge certain factual findings made by the magistrate and adopted by the trial court, arguing that these findings were erroneous and "erode the legal basis" for the court's determination that Raines established an implied easement by prior use. We previously addressed the Hodgsons' arguments regarding the findings of fact made by the magistrate and adopted by the trial court in our resolution of the Hodgsons' second through sixth assignments of error. To the extent the Hodgsons repeat their arguments in their seventh assignment of error, we overrule their arguments for the reasons set forth above.

after transfer of the property in 2002, despite the fact that Lang did not have a survey done or seek to transfer the land where the leach lines were located to Highfield in exchange for the road frontage property on the western tract being transferred to the Hodgsons. The Hodgsons permitted Highfield and Lang continued use of the leach lines at all times they possessed the property. When Raines sought to purchase the western tract, Christopher and Raines reached an agreement for the western tract's continued use of the leach lines. Raines testified he and Christopher talked and worked things out, with Christopher telling Raines, "he'd either give me an easement or sell me land, not to worry about it." After Raines purchased the property, from 2011 to September 2017, Raines continued to openly use the leach lines without incident. It was not until October 2017 that the Hodgsons took action to prevent the owner of the western tract from using the leach lines.

{¶80} Given the foregoing circumstances, we find that the trial court's determination that Raines established an implied easement by prior use for the leach lines located on the Hodgsons' property was supported by the manifest weight of the evidence. The trial court did not error in overruling the Hodgsons' objection to the magistrate's "Conclusion of Law (C)(2)," which found in favor of Raines on his claim for an implied easement by prior use. The Hodgsons' seventh assignment of error is, therefore, overruled.

{¶81} Judgment affirmed.

S. POWELL and RINGLAND, J., concur.